UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINE PIKULAS,

    Plaintiff,

v.                                          Case No. 05-70846

DAIMLERCHRYSLER,              Honorable Patrick J. Duggan

    Defendant.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on October 31, 2005.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                    U.S. DISTRICT COURT JUDGE

Christine Pikulas filed suit against DaimlerChrysler to recover long-term disability benefits under section 502 of the Employee Retirement Income and Security Act, 29 U.S.C. § 1132(a)(1)(B) ("ERISA"), after DaimlerChrysler issued a final denial of Plaintiff's claim for benefits. Presently before the Court are Plaintiff's Motion for Judgment on the Administrative Record Reversing Defendant's Denial of Benefits and Defendant's Motion to Affirm Administrator's Decision, both filed on August 1, 2005. This Court held a hearing on the motions on October 20, 2005.

**I.    Background**

Defendant's long-term disability (LTD) plan is an employer-funded disability benefits plan. Plan benefits are paid by Defendant, which is also the plan administrator. (Pl.'s Mot. Ex. 1, Art. II, secs. 2.17, 2.202; Art. III; Art. VII, sec. 7.01). As plan administrator, Defendant has the discretion to administer and interpret the Plan, including the determination of eligibility for, and payment of, plan benefits. (*Id.* at Art. VII, sec. 7.03). The plan also gives Defendant the authority to appoint a third-party administrator to administer the plan. (*Id.*). Defendant has appointed ESIS, Inc. as the third-party administrator.

Plaintiff was working as a communications specialist for Defendant DaimlerChrysler Corporation in 1992 when she was diagnosed as having Chronic Fatigue Syndrome with Lyme disease and Epstein Barr Virus. As an employee of DaimlerChrysler, Plaintiff was covered by Defendant's LTD plan. In 1994, Plaintiff's physician, Dr. A. Martin Lerner certified her as completely disabled and Plaintiff was approved for LTD benefits under the plan.

Under the plan, Plaintiff was required to provide periodic proof of her continuing disability. (*Id.* at Art. IV, sec. 4.02). As proof of her disability, from 1994 through 2003, Dr. Lerner provided Attending Physician Statements to Defendant.

In December 2000, DaimlerChrysler directed Plaintiff to undergo a "Cardio Disability Evaluation Program" examination. (Pl.'s Mot. Ex. 4, AR 288-89). On January 8, 2001, Dr. Eldred G. Zobl examined Plaintiff. Dr. Zobl's report stated that Plaintiff was "not disabled in any way from a cardiac standpoint, and that there [was] no reason for her to be on any medical disability as a result of any cardiac disability." (Pl.'s Mot. Ex. 5,

2

AR 100). However, he noted: "As far as chronic fatigue syndrome, I do not feel that I am qualified to evaluate that and I would recommend that an evaluation be referred to some other more qualified physician." (*Id.*).

After Dr. Zobl's exam, Dr. Lerner submitted Attending Physician Statements indicating that Plaintiff remained disabled due to Chronic Fatigue Syndrome, Lyme disease, and Epstein-Barr Virus. (Pl.'s Mot. Ex. 2, AR 59-62, 87-96, 102).

On October 25, 2002, DaimlerChrysler initiated a fraud investigation of Plaintiff after surveillance of Plaintiff revealed that she had been shopping and driving. (Pl.'s Mot. Ex. 6, AR 2-5). Dr. Theresa Bartlett from Defendant's Corporate Disability Program requested a health care investigation of Plaintiff. (*Id.* at 2).

On January 10, 2003, Dr. Lerner provided an Attending Physician Statement indicating that Plaintiff remained disabled due to Epstein-Barr Virus. (Pl.'s Mot. Ex. 2, AR 64).

On February 11, 2003, Plaintiff was ordered to submit to a "DC/EDB/DEP Exam" with Dr. Tom Madhavan, whose specialty is infectious disease. (Pl.'s Mot. Ex. 4, AR 281). This exam took place on February 21, 2003. (Pl.'s Mot. Ex. 5, AR 55). Plaintiff's medical information and test results from Dr. Lerner were available to Dr. Madhavan. (*See id.* at 55-58). In a report dated February 21, 2003, Dr. Madhavan concluded:

    1. Chronic fatigue syndrome, clinical picture is compatible.

    2. Doubt Lyme disease, only marginally positive serology.

(*Id.* at 58).

Moreover, Dr. Madhavan found that Plaintiff was able to "return to employment in

3

the area of management" without any major limitations, "however, she should be advised and encouraged to gradually increase her physical duty." (*Id.*).

On February 21, 2003, following the independent medical examination, Dr. Madhavan's office called the third-party administrator with the verbal result of the examination. (*See* Pl.'s Mot. Ex. 7, AR 46). That same day, the third-party administrator emailed Dr. Bartlett and another DaimlerChrysler employee, Neil Levins, which stated, in part: "CHRISTINE PIKULAS WAS FOUND ABLE TO RETURN TO WORK WITH NO RESTRICTIONS. . . . Let me know how you want me to handle this claim." (*Id.*).

On March 17, 2003, an ESIS employee contacted Plaintiff and told her that she was required to return to work. (Pl.'s Mot. Ex. 4, AR 280). Plaintiff contends that the third-party administrator also verbally informed Plaintiff that her benefit checks were stopping as of March 17, 2003, contrary to the plan's provisions which require that the third-party administrator provide written notice (Pl.'s Mot. Ex. 1, Art. VII, sec. 7.04(a)-(b)). In a letter dated March 19, 2003, Plaintiff received a written denial from DaimlerChrysler's Human Resources Manager, stating: "You have been off work because of a disability since February 5, 1993. While your leave was justified for a time, we have no medical evidence of a continuing disability beyond March 18, 2003." (Pl.'s Mot. Ex. 8, AR 40).

Plaintiff reported to DaimlerChrysler's Medical Department on March 20, 2003. Based on the results of Dr. Madhavan's examination, Defendant's physicians agreed that Plaintiff was healthy and able to work.[1] (Pl.'s Mot. Ex. 9, AR 292-94).

---

[1] Defendant's physicians did not examine Plaintiff because "she just had the thorough DEP exam done by Dr. Madhavan." (Pl.'s Mot. Ex. 9, AR 293). They found that Plaintiff was

4

Plaintiff submitted a letter from Dr. Lerner, dated March 24, 2003, which stated: "This is to indicate that Ms. Christine Pikulas meets the Centers for Disease Control (CDC) criteria for chronic fatigue syndrome. She is unable to work at this time. Her energy index score is 4.5. The cause of her chronic fatigue syndrome is persistent Epstein-Barr virus infection." (Pl.'s Mot. Ex. 10, AR 38). On April 24, May 12, and June 19, 2003, Plaintiff and her counsel advised the third-party administrator that Plaintiff had submitted further proof of disability and that Plaintiff had never received a written denial from the third-party administrator as required by the plan. (Pl.'s Mot. Ex. 7, AR 43-44, 47-50, 52-53, 302-03).[2] The third-party administrator forwarded Plaintiff's requests to Defendant DaimlerChrysler. (*See id.*).

On July 23, 2003, Defendant informed Plaintiff that her "appeal" of the termination of her LTD benefits was denied based on the results of her independent medical examination. (Pl.'s Mot. Ex. 8, AR 297). In December 2003, Plaintiff filed her first complaint in this Court alleging that Defendant violated Section 502 of ERISA when it terminated her LTD benefits. Both parties filed cross-motions based on the administrative record. However, the parties agreed to dismissal of Plaintiff's complaint without prejudice so that Plaintiff could pursue her appeal rights under the plan. (Pl.'s Mot. Ex. 11).

---

able to return to work "per her ESIS-DEP exam." (*Id.* at 294).

[2] To the extent that Plaintiff is attempting to assert that Defendant violated ERISA, 29 U.S.C. § 1133, which provides, in part, that the plan shall "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth specific reasons for such denial . . .," (emphasis added), this claim is not properly before the Court because Plaintiff did not assert this claim in her Complaint.

5

On September 2, 2004, Plaintiff filed her appeal and included documents to refute the results of her independent medical exam by Dr. Madhavan. Dr. Lerner noted his diagnosis of Lyme disease was a clinical diagnosis based on her exposure to the disease and her symptoms. (Pl.'s Mot. Ex. 2, AR 406-08). He also stated that his diagnosis of Epstein-Barr Virus depended on multiple factors, including an abnormal white blood cell count, an abnormal Holter (cardiac) monitor, and "extraordinarily high" levels of Epstein-Barr Virus antibodies. (*Id.* at 407). In addition, Plaintiff provided a July 2004 report from Dr. Steven Korotkin, a cardiologist, who opined that Plaintiff would benefit from exercise. (*Id.* at 416). Dr. Korotkin also noted that he did not believe that Plaintiff was malingering or exaggerating her symptoms. (*Id.* at 417). Plaintiff also included letters from friends and family attesting to the effects of the illness on her life. (Pl.'s Mot. Ex. 12, AR 418-33).

On November 15, 2004, after reviewing Dr. Lerner's and Dr. Korotkin's evaluations, Dr. Madhavan sent a letter to Dr. Bartlett. (Pl.'s Mot. Ex. 5, AR 436). In the letter, Dr. Madhavan acknowledged Plaintiff's Chronic Fatigue Syndrome, but noted:

> Recommendation for the patient's chronic fatigue syndrome is still graduated exercise. This is a practicing community standard at present and that is what I try to do for my patients and return them to a productive work. However, if Dr. Lerner feels that other way, I will leave it up to you to make a decision whether this patient needs a continued disability or a gradual return to work with a gradual exercise program.

(*Id.*).

Defendant sent Plaintiff to be examined by Dr. Franklin J. Rosenblat on November 30, 2004. (Pl.'s Mot. Ex. 5, AR 442-46). Dr. Rosenblat's report stated that: "Ms. Pikulas

6

certainly does appear to display the features of chronic fatigue," and "a classification of fatigue is the only diagnosis that can be made." (*Id.* at 446). However, he also reviewed Plaintiff's laboratory reports and noted that they "would be consistent with a negative prior infection with Lyme disease." (*Id.*). Moreover, he noted Plaintiff's elevated levels of antibody but stated that: "Epstein-Barr virus serology over the long term, in my opinion, is a poorly specific indicator of disease activity and I would not rely on it for the basis of a diagnosis." (*Id.*). Dr. Rosenblat's report concludes that: "From the standpoint of an Infectious Disease Consultant, without an infectious diagnosis, I would not be qualified to make an opinion regarding disability on the grounds of fatigue itself." (*Id.*).

In addition, Dr. Rosenblat did not find that Plaintiff was able or unable to return to work. Instead, he stated that if he could conduct tests to rule out chronic viral hepatitis as a cause of ongoing fatigue, then he could "be confident in ruling out an infectious cause of patient's ongoing fatigue" and then he could "offer the clear recommendation that the patient would have no ongoing infectious disease that would prevent her from returning to work." (*Id.*).

On December 14, 2004, Defendant issued a written denial of Plaintiff's appeal. (Pl.'s Mot. Ex. 8, AR 518).

On March 4, 2005, Plaintiff brought suit against Defendant pursuant to Section 502(a)(1)(b) of ERISA, asking the Court to order Defendant to reinstate Plaintiff's LTD benefits. The parties have filed cross-motions for judgment based on the administrative record.

**II.   Standard of Review**

7

In disputes concerning a denial of benefits under an ERISA plan, the court is to conduct a review "based solely upon the administrative record and render 'findings of fact' and 'conclusions of law' accordingly. In so doing, the court may consider the parties' arguments concerning the proper analysis of evidence contained in the administrative record." *Eriksen v. Metro. Life Ins. Co.*, 39 F. Supp. 2d 864, 865-66 (E.D. Mich. 1999).

Both parties agree that, in this case, the standard for reviewing the administrative record is "the highly deferential arbitrary and capricious standard of review," because the plan gives that plan administrator discretionary authority to construe the terms of the plan or determine eligibility for benefits. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). This standard requires the "least demanding form of judicial review of administrative action." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000).

In applying this standard, the court must look at whether the decision was "rational in light of the plan's provisions" and whether there was a reasoned explanation, based on the evidence, for a particular outcome. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Moreover, if the administrator's decision has a rational basis, the reviewing court should not disturb that determination, even if the court would have decided the issue differently. *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 982 (6th Cir. 1991).

## III.  Applicable Law and Analysis

### A.  The Administrative Record

Although the parties agree that this Court is to apply the arbitrary and capricious

8

standard of review when reviewing the administrative record, they dispute the scope of the administrative record. Plaintiff contends that the Court should consider all of the documents before ESIS and the record available to Defendant during the appeals process. (Br. in Supp. of Pl.'s Mot. at 6). Defendant, however, contends that the administrative record includes only those dates at issue in Plaintiff's Complaint, which Defendant contends does not incorporate any date or event earlier than March 2003. (Def.'s Reply Br. at 4).[3]

The district court is confined to the "record that was before the Plan Administrator." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998). Defendant has cited no case law which stands for the proposition that the allegations in a plaintiff's complaint should limit the scope of the record before the court in an ERISA case. Moreover, Plaintiff's Complaint does incorporate dates and events earlier than March 2003:

> 7. On or about March 1, 1994, Plaintiff became entitled and began to receive payment of disability benefits under the Plan.
>
> 8. On or about March 19, 2003, Plaintiff received a letter from Chrysler stating that the Company had no medical evidence of a continuing disability beyond March 18, 2003, and would terminated her employment unless she reported to work with acceptable substantiation for her continued absence no later than March 26, 2003.
>
> \* \* \*

---

[3] In addition, both parties have attached documents to their briefs that were not before the plan administrator. For example, both parties attached the Court's Stipulation and Order dismissing Plaintiff's first lawsuit against Defendant to provide background information, although this was clearly not before the plan administrator.

9

      14. Plaintiff remains entitled to disability benefits under the Plan . . . .

(Pl.'s Compl. ¶¶ 7-8, 14).

The Court reads these paragraphs to allege that Plaintiff has remained entitled to disability benefits since March 1, 1994, despite Defendant's decision that she was no longer disabled. Therefore, the Court will consider the scope of the administrative record to include the record that was before the plan administrator.

### B. Defendant's Denial of Benefits

Plaintiff asserts that the Court should take into account a number of factors in determining whether the denial of benefits was arbitrary and capricious, including: (1) Defendant's conflict of interest; and (2) the Social Security Administration's determination that Plaintiff is disabled. The Court will address each of these issues separately.

    1. Conflict of Interest

Plaintiff contends that because Defendant DaimlerChrysler is both the final arbiter of claims for benefits[4] and the payor of benefits under the plan, there is a conflict of interest. Moreover, Plaintiff asserts that there is significant evidence that Defendant's agents and employees were involved in the third-party administrator's decision to deny Plaintiff benefits. For example, Dr. Theresa Bartlett from Defendant's Corporate Disability Program requested a health care investigation of Plaintiff. (Pl.'s Mot. Ex. 6,

---

[4] Although the plan provides that the third-party administrator makes the initial determination of eligibility for benefits, the participant must appeal a denial of benefits to DaimlerChrysler Corporation's Disability Department. (Pl.'s Mot. Ex. 1, Art. VII, Sec. 7.04(c)).

AR 2). In addition, after Dr. Madhavan's office called the third-party administrator with the verbal result of the examination, the third-party administrator emailed Dr. Bartlett and another DaimlerChrysler employee, Neil Levins, asking: "Let me know how you want me to handle this claim." (Pl.'s Mot. Ex. 7, AR 46).

Defendant argues that this issue is not properly before the Court where Plaintiff made no corresponding allegations in her Complaint, although Defendant has cited no case law to support this proposition. In the alternative, Defendant argues that the "structural conflict of interest" which Plaintiff has identified is not dispositive of bias. The Court agrees.

Mere allegations of the existence of structural conflict of interest are not enough to show that the denial of the claim was arbitrary and capricious. *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998). Rather, there must be some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits. *Id.* For example, the plaintiff could show that the denial of coverage was based on the cost of the plaintiff's treatment. *See id.*; *see also Jackson v. Metro. Life Ins.*, 24 Fed.Appx. 290, 292 (6th Cir. 2001) (finding that the record revealed no evidence that the defendant's denial of benefits was motivated by cost); *Monks v. Keystone Powdered Metal Co.*, 78 F. Supp. 2d 647, 664 (E.D. Mich. 2000) (finding that there was nothing in the record to suggest that the defendant was motivated by its financial interest in minimizing plan payouts, "beyond the brute fact that Defendant does indeed have such a financial stake in benefit determinations"). In contrast, in *Killian v. Healthcare Provident Adm'rs, Inc.,* 152 F.3d 514 (6th Cir. 1998), the Sixth Circuit found that procedural peculiarities in the

11

review process were evidence that the defendant was improperly influenced by its structural conflict of interest. *Id.* at 521-22. Specifically, the Court found that the defendant acted arbitrarily and capriciously where, although not required by the plan to forestall consideration of additional information, it did review additional information favorable to the denial of benefits past the deadline it had communicated to the plaintiff. *Id.* The Court concluded: "This behavior makes no sense in the absence of an improper financial motive, and we therefore infer that [defendant's] actions were shaped by its conflict of interest." *Id.* at 522.

In this case, Plaintiff has shown that a structural conflict of interest exists. However, Plaintiff has failed to tie Defendant's structural conflict of interest to a bias in its decision regarding Plaintiff's benefits. Although Plaintiff has shown that a DaimlerChrysler employee initiated the health care investigation of Plaintiff and that the third-party administrator was asking DaimlerChrysler employees how it should handle Plaintiff's claim, Plaintiff has not shown how these actions demonstrate that Defendant was motivated by its financial interest.

### 2. Social Security Disability Determination

Plaintiff argues that because the plan requires proof that the participant applied for Social Security benefits and because LTD benefits are to be reduced by any Social Security benefits payable to the plan participant, (Pl.'s Mot. Ex. 1, Art. IV, sec. 4.01(g); Art. V, sec. 5.03), the Social Security Administration's determination that the participant is disabled is a factor the Court should consider, citing *Calvert v. Firstar Finance, Inc.*,

12

409 F.3d 286 (6th Cir. 2005), and *Napier v. Hartford Life Insurance Co.*, 282 F. Supp. 2d 531 (E.D. Ky. 2003).

However, both of these cases are distinguishable from the facts in this case. In *Calvert*, the Social Security Administration's determination was a part of the administrative record before the defendant in making its own disability determination, because the plaintiff had presented it to the defendant as evidence. *Calvert*, 409 F.3d at 293-94 (noting that where plaintiff had provided the SSA's determination adopting treating physician's opinion as evidence of disability, that this constituted objective support for the doctor's opinion in the administrative record). In *Napier*, the court noted that the fact that the Social Security Administration had found that the plaintiff was disabled in "subsequent evaluations," was erroneously ignored by the defendant. *Napier*, 282 F. Supp. 2d at 539.

In this case, Plaintiff did not submit evidence to Defendant at the time she filed her appeal that she was receiving Social Security benefits. In addition, Plaintiff has not submitted evidence to this Court that she is presently receiving Social Security benefits. The most recent SSA determination Plaintiff has provided is from 2001. In this case, Defendant notified Plaintiff that she had no medical evidence of a continuing disability beyond March 18, 2003 and then, Defendant denied Plaintiff's appeal on December 14, 2004. Thus, the Court will not consider the SSA determinations from 2001 and earlier as probative of whether the Defendant's determination that Plaintiff was not disabled in December 2004, was arbitrary and capricious.

    3.  <u>Chronic Fatigue Syndrome</u>

13

Plaintiff contends that she has satisfied her burden of showing continuing disability through the diagnosis of Chronic Fatigue Syndrome (CFS). Defendant argues that even if Plaintiff has shown that she has Chronic Fatigue Syndrome, she has not shown "disability" as required by the plan. According to the LTD plan, to be eligible for LTD benefits, Plaintiff must show that she is: "'totally disabled' because of disease or injury so as . . . after the first 24 months of disability to be unable to engage in regular employment or occupation with the Corporation." (Pl.'s Mot. Ex. 1, Art. IV, sec. 4.01(e)).

In a March 24, 2003 letter, Dr. Lerner averred that Plaintiff meets the Centers for Disease Control criteria for CFS and that Plaintiff was "unable to work." (Pl.'s Mot. Ex. 2, AR 38). Dr. Lerner reiterated his diagnosis of CFS in June 2004. (*Id.* at 407). Dr. Lerner concluded that Plaintiff "remains disabled at this time." (*Id.* at 407). In addition, Dr. Lerner noted that "[Dr. Madhavan's] statement [that] Ms. Pikulas is able to return to work in a management position is not supported by any of the statements of his cursory review of the record." (*Id.* at 406).

At the hearing, Defendant argued that as of Dr. Lerner's June 2004 report, Dr. Lerner had not examined Plaintiff since early 2003. The report does not clearly indicate the last date Dr. Lerner examined or treated Plaintiff. However, the report is written in the present tense and includes statements such as, "she became incapacitated and has remained incapacitated thereafter," "Her life-altering illness is allowing her to be up for several hours a day only," and "Ms. Pikulas clearly meets the Centers for Disease Control criteria for the chronic fatigue syndrome." (*Id.* at 407). Finally, at the end of the report, Dr. Lerner noted, "I am hopeful that with *continued* Valacyclovir therapy administered at

14

pharmacokinetic dosing that Ms. Pikulas will improve and have sustained improvement." (*Id.* at 408 (emphasis added)). This statement implies that Plaintiff was undergoing therapy with Dr. Lerner[5] at the time the report was written, in June 2004.

Moreover, in a letter dated July 7, 2004, Dr. Korotkin noted Dr. Lerner's diagnosis of CFS and stated "her problem is really related to the chronic fatigue that she has." (*Id.* at 416). He went on to state:

> In all of the years that I [sic] known Ms. Pikulas, I have the overwhelming feeling that her complaints are real, although I am really at a loss to explain their mechanism. I do not think that she is malingering, faking, exaggerating, nor exacerbating her symptoms and that her decrease in stamina, lack of ability to work and perform exercise, as well as her outlook and resigned status are factual.

(*Id.* at 417).

Defendant argues that Dr. Korotkin did not state that Plaintiff's CFS rendered her "totally disabled." However, Dr. Korotkin's statement that Plaintiff's lack of ability to work is factual, supports Plaintiff's contention that, under the plan definition she was "totally disabled" or "unable to engage in regular employment or occupation with the Corporation." (Pl.'s Mot. Ex. 1, Art. IV, sec. 4.01(e)).

In Defendant's December 14, 2004 letter to Plaintiff denying Plaintiff's appeal, Defendant stated: "Based on our records, including the results of your independent medical examination (IME) on November 30, 2004, which found you able to work, you are not eligible for long term disability benefits under the terms of the Plan." (Pl.'s Mot. Ex. 8, AR at 518). However, Dr. Rosenblat, who conducted the IME on November 30,

---

[5] In prior reports, Dr. Lerner discussed that he has been treating Plaintiff with Valacyclovir therapy. (*See, e.g.*, Pl.'s Mot. Ex. 2, AR 38).

15

2004, found that:

> For the time being, however, until clear basis for the fatigue can be found, a classification of fatigue is the only diagnosis that can be made. From the standpoint of an Infectious Disease Consultant, without an infectious diagnosis, I would not be qualified to make an opinion regarding disability on the grounds of fatigue itself.

(Pl.'s Mot. Ex. 5, AR 446). Dr. Rosenblat did not find that Plaintiff was able or unable to return to work.[6] Therefore, the Court does not believe that the results of Plaintiff's November 30, 2004 IME provided Defendant a reasonable basis for denying Plaintiff LTD benefits.

The only doctor that examined Plaintiff and concluded that she was able to return to work was Dr. Madhavan. Although Dr. Madhavan concurred in Dr. Lerner's diagnosis of CFS, he concluded that "[i]n my professional opinion, Ms. Pikulas is able to return to employment in the area of management and I do not see any major limitations, however she should be advised and encouraged to gradually increase her physical activity." (*Id.* at 58). Then, in a letter dated November 15, 2004, Dr. Madhavan noted:

> Recommendation for the patient's chronic fatigue syndrome is still graduated exercise. This is a practicing community standard at present and that is what I try to do for my patients and return them to a productive work. However, if Dr. Lerner feels that other way, I will leave it up to you to make a decision whether this patient needs a continued disability or a *gradual return to work* with a gradual exercise program.

---

[6] Dr. Rosenblat stated that if he could conduct tests to rule out chronic viral hepatitis as a cause of ongoing fatigue, then he could "be confident in ruling out an infectious cause of patient's ongoing fatigue" and then he could "offer the clear recommendation that the patient would have no ongoing infectious disease that would prevent her from returning to work." (Pl.'s Mot. Ex. 5, AR 446). However, there is no indication in the record that tests were conducted to rule out chronic viral hepatitis.

16

(Pl.'s Mot. Ex. 5, AR 436 (emphasis added)).

Thus, Dr. Madhavan recommended that the plan administrator could either (a) follow Dr. Lerner's recommendation of continuing disability, or (b) follow his recommendation of a *gradual* return to work. However, Defendant did not adopt either of these recommendations.

Under the arbitrary and capricious standard, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989). In this case, the Court does not believe that Defendant has offered a reasoned explanation for denying Plaintiff LTD benefits where both Drs. Lerner and Korotkin determined that Plaintiff could not work and Dr. Madhavan recommended that Defendant could *either* find Plaintiff totally disabled or return to work gradually. Therefore, Defendant's decision to deny Plaintiff's claim for LTD benefits was arbitrary and capricious.

### C. Attorney Fees and Costs

Plaintiff seeks reasonable attorney fees and costs pursuant to § 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1), (Pl.'s Mot. ¶5(g)), which provides: "In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." As the Sixth Circuit Court of Appeals noted, "[t]he language of § 1132(g) provides virtually no guidance . . . [and] [t]he legislative history is also silent as to how fee awards should be calculated." *Bemis v. Hogue*, 935 F.2d 269, 1991 WL 102385, at *6 (6th Cir. 1991). Although the

17

statute does not expressly limit an award of attorney fees to a "prevailing party," courts have interpreted the stature to allow an award of attorney fees only to a prevailing party. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 89 n.14, 102 S. Ct. 851, 862 n.14 (1982); *Cattin v. General Motors Corp.*, 955 F.2d 416, 427 (6th Cir. 1992).

In this case, Plaintiff is a "prevailing party" because the Court has determined that Defendant's decision to discontinue Plaintiff's LTD benefits was arbitrary and capricious. In deciding whether to award attorney fees to the prevailing party, courts consider the following factors:

(1) the degree of the opposing party's culpability or bad faith;

(2) the opposing party's ability to satisfy an award of attorney fees;

(3) the deterrent effect of an award on other persons under similar circumstances;

(4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regard

(5) the relative merits of the parties' positions.

*Sec'y of Dept. of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985).

Applying these factors to the present case, the Court is not satisfied that Defendant acted in bad faith. In addition, Plaintiff was not seeking to confer a common benefit on all participants and beneficiaries of the LTD plan. However, the Court is satisfied that the remaining factors weigh in favor of an award of attorney fees. First, Defendant would likely be able to satisfy an award of attorney fees in this case. Second, an award of attorney fees may have a deterrent effect on Defendant. Third, the relative merits of the parties' positions weigh in favor of an award. Accordingly, the Court finds that Plaintiff

18

is entitled to reasonable attorney fees and costs.[7]

### D. Interest

Plaintiff also seeks interest on all unpaid benefits. (Pl.'s Mot. ¶5(e)). "Since ERISA does not address the propriety of awarding prejudgment interest, such interest may be awarded in the discretion of the district court." *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992); *see also Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998) (finding that an award of prejudgment interest serves to compensate the plaintiff "for the lost interest value of the money wrongly withheld from him or her"). "Awards of prejudgment interest are compensatory, not punitive, and a finding of wrongdoing by the defendant is not a prerequisite to such an award." *Id.*

Plaintiff's LTD benefits were discontinued on March 19, 2003. The Court is satisfied that to fully compensate Plaintiff, she must be awarded interest from the date Plaintiff's LTD benefits were discontinued, March 19, 2003.

**SO ORDERED.**

                                                        s/PATRICK J. DUGGAN
                                                        UNITED STATES DISTRICT JUDGE

Copies to:
Kathleen L. Bogas, Esq.
Lisa S. Lane, Esq.

---

[7] The Court notes, however, that § 502 does not permit parties to recover attorney fees for legal work performed during the administrative phase of a benefits proceeding. *See Anderson v. Procter & Gamble Co.*, 220 F.3d 449, 456 (6th Cir. 2000).

20